## COURT OF SPECIAL SESSIONS — NEW YORK — APPELLATE DIVISION — FIRST JUDICIAL DEPARTMENT.

### April, 1923.

### THE PEOPLE v. ANNETTE SULLIVAN.

#### (120 Misc. 618.)

CONVICTION FOR INCORRIGIBILITY—WHEN PRESUMPTION AGAINST VALIDITY OF COMMITMENT WILL NOT BE INDULGED.

A police officer of the city of New York laid an information charging defendant, a girl nineteen years of age, with incorrigibility under section 1466 of the Consolidation Act (Laws of 1882, chap. 410) and the acts amendatory thereof and brought her before a city magistrate. Upon the trial she was adjudged willfully disobedient to her mother

and in danger of becoming morally depraved because of her vicious habits and associations. Upon the affidavit of her mother, verified before a city magistrate, setting forth various acts of misconduct on the part of the defendant and ample proof that she was associating with vicious and dissolute persons, she was committed by the magistrate to the House of the Good Shepherd. Upon an appeal from the judgment of conviction and said commitment, the only court paper returned to the magistrate was a copy of the information. *Held*, that this court was not bound to assume that the arrest was made on a warrant but would assume that defendant was legally arraigned and the judgment of conviction and the order of commitment will be affirmed.

FRESCHI, J., concurs; EDWARDS, J., dissents.

APPEAL from a judgment of conviction on a charge of incorrigibility and a commitment to the House of the Good Shepherd, after trial had in a City Magistrate's Court, ninth district, borough of Manhattan, on the 2d day of February, 1923.

*Joseph W. Shallock,* for appellant.

*Joab H. Banton, District Attorney (Edwin P. Kilroe* and *Felix C. Benvenga,* of counsel), for respondent.

KERNOCHAN, C. J.:

This is an appeal from a commitment made on February 9, 1923, to the House of the Good Shepherd, the appellant having been adjudged willfully disobedient to her mother, Catherine Sullivan, and that by reason of her vicious habits and associations is in danger of becoming morally depraved. The affidavit upon which this commitment is based was made by Catherine Sullivan, mother of the appellant, and was verified January 26, 1923, before the Hon. H. Stanley Renaud, a city magistrate, sitting in the ninth district Magistrate's Court, borough of Manhattan, city of New York. The action is entitled " The People of the State of New York, on complaint of Police Officer Daniel E. Foley, 23d Precinct, vs. Annette Sullivan." An indorsement on the back of the information is as follows: " Adjourned to January 29th, 1923, 10:30 A.M.,

Paroled to F. C. L." This undoubtedly means the Florence Crittenden League. Another indorsement shows that sentence was deferred to February 9, 1923, at ten-thirty, and that defendant was paroled to " F. C.," which are the initials of the Florence Crittenden League. This indorsement is initialed " N. J. M." Another indorsement not dated reads, " The defendant having been informed of the charge and right to counsel, pleads ' not guilty.' Tried and convicted, N. J. M. Committed to the House of Good Shepherd, N. J. M." The initials are those of the Hon. Norman J. Marsh, the city magistrate who presided at the trial and committed the appellant.

The only court paper returned by the magistrate is a copy of the information. There is no return of a warrant, and the reviewing court is bound to assume from this that no warrant was issued.

The first point raised by the appellant is that " The magistrate had no jurisdiction to issue the warrant in this case on which the commitment was based." From this point the appellant argues that the court obtained no jurisdiction. (People ex rel. Olin v. Warden, '170 App. Div. 289; affd. 218 N. Y. 704.) In view of the fact that the magistrate makes no return of a warrant there is no reason for this court to assume that this arrest was made on a warrant, outside of the bare assertion in the appellant's brief. This point appears to be disposed of against the appellant.

We must also assume that the defendant was arraigned before the magistrate legally, as this arraignment has not been attacked by the appellant except as stated above; indeed it would seem as though the defendant had been brought before the magistrate by a police officer, as the statute provides, for the title is " People of the State of New York on the complaint of Police Officer Daniel E. Foley."

The evidence shows that the appellant is nineteen years old and that her father and mother are living and that she has been brought up in the Roman Catholic faith; that at school she was

a backward and difficult scholar; that about four years before she went out with a man and stayed away from home from Saturday until Monday; that at that time her mother took her to the police station and was there advised to go before the judge; that on promise of the girl that she would be good no further steps were taken.

The reason for the present proceedings was that the appellant left home on Monday, December 4, 1922, and was not found by her family until Sunday, December tenth, when she was found by the police seriously wounded by a revolver shot at the Terrace Hotel, 436 West Twenty-third street, where she had gone with a man called Kavanaugh, and that they had occupied a room, having registered as man and wife under an assumed name. The appellant told the police officer she had been shot by Kavanaugh because she would not take off her clothes. After appellant was released from the hospital she returned to her mother's house, but on January twenty-fifth she left home again against the wishes of her parents and remained away until she was arraigned in court the following day.

The statute does not define crimes in the strict sense and does not aim at punishment, but looks rather to the welfare of the offender, and in this case it is amply proved that the appellant was associating with vicious and dissolute persons. Both her moral and physical welfare were endangered by her association with the vicious brute who, as she told the officer, " shot her because she wouldn't take off her clothes," and her infatuation for him was such that after recovery from her wounds, against the wishes of her mother, she deserted her home and contemplates marrying her assailant.

The appellant contends that because she wished to marry this man, her mother had no right to restrain her, and alleges that her parents had no right to oppose her will in this because she was over the age of eighteen, and had she married without the consent of her parents, this marriage could not be annulled by

them. I do not believe that this prevents parents from doing all in their power to prevent their daughters from entering into a marriage which is as plainly unsuitable as this one must be, and it must be borne in mind that a parent is entitled to the services of a minor child up to the age of twenty-one. This statute was enacted to aid parents in protecting their daughters from the consequences of such an unfortunate infatuation as this one seems to be.

The appellant also contends that the court should have granted further adjournment to her on the last day of the trial, and in not doing so was guilty of such an abuse of discretion as to justify a reversal. I cannot agree with this proposition in view of the fact that the appellant did obtain one adjournment for the purpose of procuring witnesses, even after she had announced in court that she had rested her case. There is no evidence to show that counsel tried to communicate with the appellant during the adjournment that was granted, or, if he did try, that this opportunity to consult was denied him.

The judgment of the Magistrate's Court should be sustained.

FRESCHI, J. (concurring):

Obviously, the praiseworthy purpose of this law is to protect the weak and to encourage a life of purity and self-restraint. In dealing with girls charged with its violation, we are bound, I think, to determine the power of intellect, the sensibilities and the will of each particular defendant concerning matters of right and wrong in character and conduct. It is only by degrees that a juvenile acquires physical and mental development, says Morrison in his work on "Juvenile Offenders;" and he adds that the maturity of character is largely dependent on physical maturity. "In order that a being may have a moral nature and be justly held responsible for his conduct, he must be intelligent enough to be able to choose and pursue one of these in preference to the other. These two

conditions appear to exist in all men." . Of course, there will always be differences of opinion on this subject as to what specifically is right and wrong, but one thing is manifestly essential in the proof of these cases, and that is that the wrong complained of should be a reflex of the individual's moral character and show that he or she is in danger of becoming depraved.

It seems to me that we should not approve or defend behavior such as this appellant has committed. The ability of her mind to perceive the moral qualities of her actions is doubtful. Certainly, her moral judgment—the process of examination to reason a conclusion—in matters of conduct and manner of life is warped and there is need for some form of limitation and restraint.

In the determination of issues such as is presented here, courts are bound to be guided by, and to apply in this class of cases, the accepted standards of our modern civilization in every day life under the given conditions of each case; and in reaching a conclusion as to the innocence or guilt of persons charged with criminal conduct, we should " go beyond the acts themselves " and take into consideration the real or probable intentions with which the acts were committed. What were the apparent and probable intentions of this defendant with respect to her particular acts, as well as with respect to her general course of behavior? Did she do the acts charged in the hope of securing the greatest good for herself? Were her motives honest? Under this statute she is forbidden to do certain things because they are bad for her, and at this period of her mental and moral development, i.e., during her minority, the defendant is required to recognize not alone the proper exercise of parental authority, the commands and limitations of her parent or guardian, unless emancipated, but also the fundamental principles of righteousness which underlie all human conduct, and which require obedience and demand respect to the parent and to the dictates of moral law in its ap-

plication to the family relation, tested by the distinction between right and wrong. This duty of the defendant rests on the fundamental of protection of the family and its social welfare. We must judge one by the company he or she keeps, as influencing, in part, character and conduct. An association with a man who is possessed of a firearm and who will use it in the manner and under the circumstances described by the defendant to the policeman at the time she was injured, is obviously bad, and undoubtedly will lead to disastrous results. If the defendant's motives were honest in any degree and if matrimony was in her mind at the time that she associated with Kavanaugh, why did she not have the courage of her convictions and act with decision rather than subject herself to the disgrace of an act that, to say the least, is extremely suspicious so far as her morals are concerned. It seems to me that the irresistible conclusion is that the defendant has not attained that degree of maturity and stage of development where it can be said that under such circumstances the situation did not have a demoralizing influence upon her and that her morals were not likely to be endangered.

The statute, referred to in the opinion of my learned associate, Chief Justice Kernochan, with whose judgment I concur, is not repugnant to the rules of the common law, nor does it expressly or by implication alter the principles governing the relation of parent and child. It is a relation which establishes well-recognized and universal legal duties and obligations on the part of each, involving the powers of the parent over the child and its obligations to the parent. These common-law obligations, based in these instances, on principles of natural law of the parent towards his child, include the duty to maintain (See also, Code Crim. Pro., § 899, and Penal Law, § 482), protect and educate him (See also, Laws of 1874, chap. 421); and among his rights and prerogatives is the parental authority to discipline and correct the child, which he should not neglect. There is a moral duty as well as the legal duty imposed by the

statute. The legal guardian is entitled to the custody and to the services of a child, unless consideration affecting its health and welfare may justify a court in withholding the custody in a proper case. The statute under consideration deals with the wickedness and rebellion of the child, and possibly ingratitude, in so far as it related to immorality. By the law of society, such conduct is wrong and calls for discipline and the adoption of reasonable measures of parental control and the exercise of the power of chastisement.

Blackstone (in book I, chap. xvi, p. 452) says: "The power of parents over their children is derived from the former consideration, their duty; this authority being given them, partly to enable the parent more effectually to perform his duty, and partly as a recompense for his care and trouble in the faithful discharge of it. * * * He may lawfully correct his child, being under age, in a reasonable manner; if this is for the benefit of his education."

The father may "emancipate" his minor child, as it is termed, i.e., resign or renounce his claim to his child's services and earnings and allow him to labor on his own account. The father may even sue for injuries or wrongful acts to his child (Cuming v. Brooklyn City R. R. Co., 109 N. Y. 95), and may also, during minority, recover consequential damages for injuries resulting from a seduction of the daughter or loss of services or for the disgrace and dishonor to the family. (Mulvehall v. Millward, 11 N. Y. 343; Gray v. Durland, 51 id. 424; Furman v. Van Lise, 56 id. 435.)

"The legal power of a father * * * over the persons of his children ceases at the *age of twenty-one,* for they are then enfranchised by arriving at the years of discretion, or that point which the law has established, as some must necessarily be established, when the empire of the father, or the other guardian gives place to the empire of reason. Yet, until that age arrives, this empire of the father continues, even after his death; for he may by his will appoint a guardian to his chil-

dren. He may also delegate part of his parental authority, during his life to the tutor or school-master of his child; who is then *in loco parentis,* and has such a portion of the power of the parent over his children committed to his charge, viz.: that of restraint and correction, as may be necessary to answer the purpose for which he is employed."

" The duties of children to their parents arise from the principle of natural justice and retribution, for to those who gave us our existence we naturally owe subjection and obedience *during minority* and honor and reverence ever after." Black Com. supra.

The age of the offender, her status and the nature of the offense are questions which should be seriously considered in this class of cases. (See People ex rel. Palter v. Warden, N. Y. L. J., April 5, 1923, Supreme Court, Special Term, Mullan, J.)

I have referred at length to the rights of parents because of the considerations here involved, arising out of the point made that this defendant has reached the age of legal consent and the contention that she was a free agent in the premises.

The ends to be attained by this law are salutary—the highest good to the girl—to make her a good citizen under the civil law and a morally good woman under the moral law. From the character and scope of this statute, I should say that its binding force is in the fact that it deals with the regulation of the conduct of female children who are minors. Plainly, its interpretation and application require that those clothed with authority, such as parents or tribunals, be held to have the right to demand obedience and to impose correctional and reformatory treatment where the moral welfare of the child is concerned.

My vote is to sustain the order and commitment of the magistrate herein.

EDWARDS, J. (dissenting):

The defendant, nineteen years of age, by the order from which her appeal is brought to this court was committed to the Roman Catholic House of Good Shepherd after a hearing upon the complaint of her mother charging that she was disobedient and in danger of becoming morally depraved.

Apparently the defendant became infatuated with a man whose acquaintance she made, and she was guilty of impropriety of going to a hotel in his company. It was not shown that she occupied a room there with the man or that she committed any other misconduct. She was found at the hotel suffering from a bullet wound said to have been inflicted by her companion. The only act of disobedience by the defendant of parental command, sufficiently recent to serve as ground for the order, shown in the record, was that after the occurrence at the hotel she left her home over her mother's prohibition, going to the home of this man where his mother and sister resided. The foregoing is also the extent of the proof of threatened depraving influence.

As I view the case, it may be decided upon this appeal on the merits, and, therefore, it is unnecessary to determine the question of procedure discussed by counsel on the contention of the appellant that a requisite condition precedent for the initiation of the proceeding was not shown to exist.

The statute here applied (part of the 1st subdivision of paragraph 1, § 1466 of the Consolidation Act, as amended by Laws of 1886, chap. 353; Laws of 1903, chap. 436; Laws of 1904, chap. 537; Laws of 1914, chap. 445) is quite general in description of the offense, and should be read in connection with the context and with other legislation dealing with the same subject, giving to the terms used their meaning as commonly understood.

The case of People ex rel. Olin v. Warden, 170 App. Div. 289, does not hold, as I read it, that the amended section 1486

deals only with the form of remedy when a defendant is in lawful custody under some other provision of law, but I think it does hold distinctly that the general terms used in the statute are not to be taken in the full universality of their possible literal breadth, but are to be restricted in interpretation by the nature of the subject and the necessity of avoidance of any undue invasion of personal liberty.

It is not intended, in my opinion, that every act of willfulness of a child, even though it have an element of peril, especially of a child who has reached the years of maturity and discretion, is to be taken as sufficient basis for the action of a court in a criminal proceeding like this, with the deprivation of liberty it involves. Legal science, keeping pace with the advance of enlightened civilization, recognizes that moral character must, after all, depend, when the individual has attained to years of discretion, upon personal effort moved by intelligent conscience, aided by educated habit and by general adherence of society to the rules of a sane moral code; and that it is impossible for the state to accomplish by any form of compulsion moral integrity in the citizen. The function of the state to control individual conduct by physical restraint is in the main confined to cases where without such restraint such conduct would seriously disturb the peace and good order of the community, so that resort to the methods of the criminal law must be had for the purpose of repression.

The defendant is nineteen years of age. According to common opinion one ceases to be a child, so far as childhood implies immaturity, when the age of puberty is reached; and, after the compulsory restraints which are rightfully applied to immature infants are no longer timely because of the advancing age of the minor, the child who has become a woman or a man must be classed for general purposes of control of conduct with the adult members of the community, and the same methods have to be applied to enforce such conduct as public interests require in the case of minors of this class as in the case

of adults. In order to justify their restraint in a proceeding like this there must be such criminal propensity as can only be prevented from disastrous consequences by such means.

As to the class of persons who are to be deemed disobedient so as to be subject to be dealt with under the statute we are considering, resort may be had in aid of interpretation to other statutes *in pari materia*. The State Charities Law, in section 204 thereof, provides for the commitment of a female not over sixteen years of age, specifying as one of the reasons for commitment that such female " is found associating with vicious and dissolute persons or is wilfully disobedient to parent or guardian, and is in danger of becoming morally depraved." It is significant that in the same statute, which seems to include a general scheme for the care of persons requiring guardianship of governmental authority, the only provision made for females over sixteen years in such class is found in section 226, which provides that a female between the ages of sixteen and thirty years in the circumstances stated may be committed to the institutions named, but contains no mention of disobedience to parent or guardian and danger of becoming depraved as occasion for such commitment.

Likewise under the Penal Law (§ 486, subd. 7) provision is made for proceeding for discipline of ungovernable children actually or apparently under sixteen years of age; and I have not been able to find in any statute of general application in the state that a proceeding of a criminal nature is authorized for the detention of a child as disobedient to parent or guardian unless the child is actually or apparently under sixteen years of age when such proceeding is instituted.

It is to be considered further that for many purposes the age of eighteen in a female removes her distinctly from the class of children. The crime of rape in the second degree cannot be committed upon a woman who has attained that age, her consent being sufficient to prevent conviction of rape in any degree.

She is allowed to marry without her parents' consent, and upon such marriage guardianship of her person ceases.

Of course I do not mean to say that the remedy for disobedience of minors conjoined with their exposure to influences of vicious surroundings, such as being in a brothel or consorting with prostitutes, under the provisions of the amended section of the Consolidation Act is confined to females under sixteen years of age (See People ex rel. Kuhn v. P. E. House of Mercy, 133 N. Y. 207, where on a writ of habeas corpus the Court of Appeals sustained the detention of a female committed at the age of seventeen under this statute, the contention of the relator relating to another point) ; but in the larger scope of review, on this appeal, than that permitted in the hearing upon the return to a writ of habeas corpus, it must be determined whether in the discretion of the court the remedy ought to be applied in the particular instance presented.

To what extent the statute is intended to limit individual freedom and to what extent it is effective in substituting state control for parental control of minors, or in enlarging such control, I do not attempt to say, but I am unhesitatingly of the opinion that it does not and cannot have the effect of putting in the criminal class and subjecting to incarceration a woman nineteen years old for the offense of clinging to her lover even to the point of indiscretion and in defiance of her mother's prohibition, and however unworthy he may be of her devotion.

In view of the purpose of the statute under consideration and of the element of policy above outlined to be kept in mind in construing and applying the law, I am of the opinion that the dealing with this case in the manner shown in the record before us was not warranted under the law and that the order appealed from ought to be reversed on the facts.

Judgment and order appealed from in all respects affirmed; defendant directed to appear before the Court of Special Sessions, Part I, on Monday, April 23, 1923, at the opening of

court, in execution of the commitment in this case, in accordance with the condition of her recognizance.